**In re Warren F. MacDONALD, Jr., Debtor.**

**Mary Ellen MacDONALD, Plaintiff**

**v.**

**Warren F. MacDONALD, Jr., Defendant.**

**Bankruptcy No. 85–02924. Adv. No. 85–0178.**

United States Bankruptcy Court, D. New Jersey.

Dec. 31, 1986.

---

Hoffman, Di Muzio, Hoffman & Marcus by Scott H. Marcus, Woodbury, N.J., for Mary Ellen MacDonald.

Thomas J. Subranni, Atlantic City, N.J., for Warren F. MacDonald, Jr.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

The matter presently before the court is a complaint filed by Mary Ellen MacDonald (plaintiff) to determine the dischargeability of certain debts of the debtor, Warren F. MacDonald, Jr. (debtor) under 11 U.S.C. § 523.

The issue before this court is whether the debtor's agreement to indemnify and to hold the plaintiff harmless on account of certain joint obligations set forth in the parties' Property Settlement Agreement is "in the nature of alimony, maintenance, or support" within the meaning of 11 U.S.C. § 523(a)(5), and accordingly non-dischargeable.

This court has heard the testimony of the debtor, the plaintiff, and counsel for the debtor in connection with the plaintiff and the debtor's divorce proceeding and the execution of the property settlement agreement, and has reviewed the pleadings filed herein and makes the following findings of fact and conclusions of law.

On October 19, 1983 a Judgment of Divorce was granted to the debtor and plaintiff by the Superior Court of New Jersey, Chancery Division, Cape May County. A Property Settlement Agreement (PSA), entered into by the plaintiff and the debtor on June 8, 1983, was incorporated in the Judgment of Divorce. At the time of the execution of the PSA, the plaintiff and the debtor had been married for approximately fifteen (15) years. The plaintiff and the debtor had four (4) children then age 13, 11, 10 and 8.

The PSA provided under its "Recitals" section in pertinent part:

5. PURPOSE OF AGREEMENT: The parties mutually desire between themselves to settle all rights, inter-se that have arisen or may arise during the term of the marriage in and to all property, both real and/or personal, acquired during the marriage through the employment or other income of the parties, through gifts and/or inheritances or by any other means, and any other rights which may have arisen during the course of the marriage, including but not limited to custody and visitation, support and

maintenance, as well as division of property, where applicable.

6. CONSIDERATION: The consideration supporting this Agreement consists of the mutual covenants and terms herein contained.

The PSA provided under the "General Provisions" section in pertinent part:

1. DEBTS: Except as otherwise herein expressly provided, the Wife represents and warrants to the Husband that she has not incurred any debts or obligations for which he or his estate may be liable. Except as otherwise herein expressly provided, the Husband represents and warrants to the Wife that he has not incurred any debts or obligations for which she or her estate may be liable. If either party has incurred such debts or obligations, he or she shall be solely responsible for them, and if the other party is called upon to make any payment or contribution toward the same, the responsible party shall indemnify and hold the other party harmless from any obligation thereon.*

* Husband also agrees to indemnify and hold Wife harmless on account of any and all education loans which he has incurred, loan with Navy Federal Credit Union, and all credit card obligations incurred by either party up to date of the execution of this AGREEMENT.

2. MUTUAL RELEASES. Subject to the provisions of this Agreement, each party has released and discharged and by this Agreement does for himself or herself, or his or her legal heirs, legal representatives, executors, administrators and assigns, release and discharge the other of and from all causes of action, claims, rights or demands whatsoever in law or equity which either of the parties ever had or now has against the other. Excepted from these mutual releases are any and all causes of action for divorce and/or revisions of judgment of a New Jersey court to which this Agreement is appended by mutual consent of the parties. Further, nothing herein contained shall require either party to renounce or

disclaim any gift, devise or request which he or she may be given by the other's Will, Trust or other document.

5. VOLUNTARY EXECUTION: Each party acknowledges that they have read this Agreement and any attached Schedules in the entirety. Each party further acknowledges that they have full and complete knowledge of the income and property of the other, and that each has been fully informed as to his or her legal rights and obligations. Each party represents that the Agreement is being entered into voluntarily, that it is not the result of any duress or undue influence, and that the provisions and terms are fair, adequate and satisfactory.

13. EMANCIPATION EVENT: The obligation of Husband to pay any child support shall terminate upon the first happening on any of the following events which shall constitute an emancipation event:

(a) The death of the Husband.

(b) The death of a child.

(c) The marriage of a child.

(d) The entry into the Armed Forces of the United States of any child of the parties.

(e) The attainment of 18 years of age by a child, or graduation from high school, whichever event last occurs, if said child has not been enrolled in college.

Under the "Special Provisions" section of the PSA, the plaintiff was given custody of the children, and the debtor was given certain visitation rights. That section of the PSA further provided:

2. DIVISION OF ASSETS

(a) The Wife shall receive the sum of $45,000.00 and such other sums as are outlined in this Agreement for and in consideration of her waiving any and all of her right, title and interest in the marital premises at 458 Shore Road, Ocean View, New Jersey, and in Ocean View Orthopedic, Inc., a New Jersey corporation, owned by her husband.* The Wife by the execution of the Agreement further understands that

she is waiving any right, title or interest she may have in any other marital asset including, but not limited to, her husband's pension plan and profit sharing plan.

* The $45,000.00 shall be paid to the Wife on Thursday, June 9, 1983.

(b) In addition to paying the wife $45,000.00, the Husband shall also be responsible to indemnify and hold his wife harmless for any debts or obligations arising out ot [sic] the mortgage or any other household related expenses for the property at 458 Shore Road. The Husband also agrees to be responsible for any liability which may result from the 1981 income tax return in the event said return is audited and there is an Order to pay.

(c) Wife is to receive the 1983 Van and be responsible for payments. Husband shall pay insurance until wife has established residence in Pennsylvania.

(d) The Husband further agrees to be responsible and hold the Wife harmless for the present debt for all equipment owned by Ocean View Orthopedics, for and in consideration of Wife resigning from said corporation.

(e) It is further agreed between the parties that the Husband shall pay to the Wife the sum of $3,000.00 for moving expenses, payable within thirty (30) days after the execution of this Agreement.

(f) The parties mutually agree to refrain from harassing each other or interfering with the lifestyle of the other.

(g) The Wife has been represented by Valerie Armstrong, Esquire and understands full well that she would be entitled to a trial on the issues of alimony and child support and equitable distribution and agrees to the terms and conditions contained herein after discussion with her attorney and such other persons in whom she may confide for the purpose of this Agreement.

(h) The Wife shall be entitled to have her choice of the household goods and furnishings (including some items located in the medical office) which are located at 458 Shore Road, Ocean View, New Jersey, which items shall become her sole and separate property, with the understanding that some items will be left behind for the Husband.

3. UNDERSTANDING OF PARTIES CONCERNING SUPPORT AND/OR MAINTENANCE:

(a) The Husband agrees to pay the sum of $350.00 per week for the support of the four (4) minor children of the marriage, until they are emancipated. In the event any child attends college, the Husband further agrees to be responsible for all costs and expenses relating to their college education including but not limited to room, board, tuition, books, activity fees, etc. The Wife agrees to consult with Husband concerning which college each child shall attend.

(b) The Husband agrees to pay the sum of $500.00 per week in alimony until the youngest child reaches the age of eighteen (18) years, or until the death of the Wife, whichever first occurs. The alimony shall continue if Wife remarries. Support and alimony to commence upon the departure of Wife from the household.

(c) The Husband agrees to maintain a policy of life insurance in an amount no less than $500,000.00 and a disability policy in the amount of $3,000.00 per month, naming the children as the irrevocable beneficiaries and the policies are to continue in effect until the last child is emancipated.

(d) The Husband agrees to be responsible for the Wife's health insurance policy, Blue Cross and Blue Shield, Rider J, or its equivalent until the death of either party or her remarriage, but the Wife shall be responsible for her own non reimbursable medical expenses.

4. EQUITABLE DISTRIBUTION WAIVER:

It is the intention and understanding of the parties to this Agreement that the property division as herein contained shall be complete and full equitable distribution of assets acquired during the marriage. Each of the parties shall have the right, after the date of this Agreement, to acquire assets free and clear of any equitable distribution claim by way of equitable distribution as well as any claim by inchoate of [sic] choate rights of curtesy and/or dower and shall execute any documents to carry out this waiver on assets of a real and/or personal nature which may be acquired after the date this Agreement is signed. This waiver is part of the consideration supporting this Agreement.

On June 4, 1985 the debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984. The debtor listed in his schedule of unsecured debts obligations due to First Jersey National Bank/South, Navy Federal Credit Union and the plaintiff.

The complaint filed by plaintiff contains two counts. In the first count of the complaint plaintiff seeks a determination that the obligation of debtor to plaintiff arising out of certain portions of the PSA is non-dischargeable. Plaintiff sets forth in the first count of the complaint those obligations as follows:

1. The obligation of the debtor arising as a result of language in the PSA stating that "the Husband (debtor) represents and warrants to the Wife (plaintiff) that he has not incurred any debts or obligations for which she or her estate may be liable."

2. The debtor's obligation for support and alimony in the aggregate amount of $850.00 per week and "such additional support as appears within the PSA."

3. The debtor's obligation to indemnify plaintiff as to all debts and obligations.

Plaintiff also seeks by the first count of the complaint, attorneys fees and costs incurred in the filing of the instant complaint.

Under the second count of the complaint, the plaintiff seeks a judgment that a debt owed by the debtor to First Jersey National Bank/South, as successor in interest to Guarantee Bank, of which the plaintiff is a co-obligor, is non-dischargeable, and seeks judgment in the amount of the indebtedness, plus interest, and attorneys fees. The indebtedness was incurred for the purchase by the debtor of certain x-ray equipment. The plaintiff asserts that this indebtedness is in the nature of alimony and support pursuant to the terms of the PSA which provides: "Except as otherwise herein expressly provided, the Husband represents and warrants to the Wife that he has not incurred any debts or obligations for which she or her estate may be liable," and that "the Husband further agrees to be responsible and to hold the Wife harmless for the present debt for all equipment owned by Ocean View Orthopedics, for and in consideration of Wife resigning from said corporation."

The debtor filed an answer to the complaint. In that answer the debtor denies that under the PSA he agreed to indemnify the plaintiff for all debts and obligations. The debtor further denied that he breached any representation and warranty to the plaintiff concerning incurred debts or obligations on the basis that the debt complained of was known to both the debtor and the plaintiff. The debtor admits that he incurred an indebtedness to First Jersey National Bank/South arising out of the purchase of certain x-ray equipment, but leaves plaintiff to her proofs concerning that obligation.

The debtor also asserts two separate defenses in his answer. First, the debtor argues that his obligation to indemnify plaintiff for those debts ennumerated in the PSA is a dischargeable obligation

which is in the nature of a property settlement and not in the nature of alimony, maintenance or support, the latter being non-dischargeable under 11 U.S.C. § 523(a)(5). The debtor also asserts that he did not breach any representation or warranty to plaintiff with respect to the disclosure of debts or obligations for which the plaintiff or her estate may be liable since the debts which are the subject of this complaint were absolutely known to both the Plaintiff and the debtor at the time they entered into the PSA. Accordingly, the debtor seeks dismissal of the complaint, together with counsel fees and the costs of suit.

The debts at issue at trial were the following obligations listed in the debtor's Chapter 7 bankruptcy petition:

1. A debt due by the debtor to First Jersey National Bank/South in the approximate amount of $77,629.54, in connection with which plaintiff is a co-obligor.

2. A debt due by the debtor to Navy Federal Credit Union in the approximate amount of $14,657.00 in connection with which plaintiff is a co-obligor.

3. An obligation due to plaintiff for debts in an unstated amount.

At trial the debtor stated through counsel that he was not seeking a discharge of the express alimony and support obligations he owed the plaintiff and which are contained in the PSA.

The two debts at issue arose as follows. The Plaintiff seeks to have a debt due by the debtor to First Jersey National Bank/South declared non-dischargeable. First Jersey National Bank/South is the successor to Guarantee Bank. On August 29, 1980 the debtor and the plaintiff obtained a loan from Guarantee Bank in the amount of $81,000.00. The loan agreement dated August 29, 1980 was signed by both the debtor and the plaintiff. The loan was obtained in order to purchase certain x-ray equipment and meet certain business expenses in connection with the debtor's business. The debtor was then and still is an orthopedic surgeon. Under a Security

Agreement dated August 29, 1980 entered into between the debtor and plaintiff and Guarantee Bank, the Bank obtained a security interest in the certain itemized x-ray equipment and "any and all addition or additions thereto and any and all substitution of substitutions and replacement or replacements thereof to any and all X-ray equipment contained in office located at 15 N. Main Street, Cape May Court House, N.J."

On July 23, 1982 the debtor and the plaintiff executed a Demand Note in the sum of $82,500.00 in favor of Guarantee Bank. At the time of trial First Jersey National Bank/South, as successor to Guarantee Bank, had instituted suit against the plaintiff in the United States District Court for the District of New Jersey for judgment against the plaintiff as defendant therein in the sum of $77,629.54 together with interest from September 9, 1985 and costs, allegedly due to First National Bank/South on the July 23, 1982 Demand Note.

Plaintiff also seeks to have a debt due by the debtor to Navy Federal Credit Union declared non-dischargeable. On June 27, 1979 the debtor and the plaintiff executed a "Loan Application, Promissory Note and Full Disclosure Statement" ("Loan Application") with Navy Federal Credit Union. Pursuant to that Loan Application, the debtor and the plaintiff acknowledged an old loan balance of $4,640.72 and a new loan in the sum of $14,657.50.

At the December 9, 1985 hearing, the plaintiff testified that when she and the debtor were first married she worked putting the debtor through medical school but once the debtor graduated she did not work until 1979 when the debtor went into private practice and the plaintiff became the debtor's office manager. The plaintiff worked as the debtor's office manager until shortly before the parties' separation. Plaintiff further testified that at the time the property settlement agreement was executed, the debtor's gross income before taxes was approximately $400,000.00, and his net income before taxes was approxi-

mately $225,000.00. Additionally, she noted that the debtor's business resulted in his having reimbursable tax expenses, such as an automobile, travel and entertainment expenses. Plaintiff explained that the child support payments of $350.00 per week and the alimony payments of $500.00 per week which payments the debtor was required to make under the PSA, represented one-half of the debtor's take home pay at the time the PSA was negotiated.

Specifically, with regard to the debt to First Jersey National Bank/South, plaintiff testified that the debt was a business debt taken in order to purchase x-ray equipment and to pay business expenses when the debtor opened his medical practice. With regard to the Navy Federal Credit Union debt, plaintiff testified that the debt was incurred in 1979 or early 1980 to meet ordinary living expenses when the debtor first came out of the armed services and began his private medical practice. Plaintiff stated the Bank debt was not enumerated in the same section of the PSA as the Credit Union debt because the Bank debt was a business debt. The plaintiff also testified that she did not receive any property under the PSA which was purchased with monies obtained from either of the two subject loans. Plaintiff further testified that pursuant to the PSA she did not receive any of the debtor's business property, or his pension from the business.

The plaintiff further stated that the debtor initiated the taking of both of these loans. The plaintiff indicated that at the time the PSA was executed, her understanding was that the debtor would assume responsibility for both of the subject debts. She further stated that if she thought that she was to be responsible for these two debts, she would not have consented to the PSA because she could not afford to raise four children and pay these debts.

The plaintiff testified that her annual income at the time of the hearing was approximately $42,000.00, that amount representing monies she receives from the debtor in the form of alimony and child support payments.[1] The plaintiff stated that she obtained a real estate license in December, 1984 and worked in the real estate business for approximately 9 months, until August or September of 1985. During that time the plaintiff earned commissions on two real estate sales. The Plaintiff also took a salaried secretarial job with a real estate firm for four months during that period and earned $225.00 per week before taxes, but plaintiff testified that with four children, she was unable to continue her employment. The plaintiff testified that she received a lump sum payment of $45,000.00 from the debtor under the PSA, representing her share of the marital residence in addition to furniture and furnishings from the marital residence, and $3,000.00 in living expenses arising from the parties' separation. The plaintiff testified that she invested the $45,000.00 in her present home in Pennsylvania, and presently carries a $70,000.00 mortgage on that property.

With regard to the two loans, plaintiff testified that she has been sued by First Jersey National Bank/South for outstanding payments, and that demands have been made of her by the Navy Federal Credit Union for overdue payments. The plaintiff testified that her obligations on these two debts total with penalties approximately $99,500.00 of which approximately $13,222.02 is due to the credit union and $77,629.54 plus interest and costs is due to the Bank.

Richard Alten, Esquire also testified at the December 9, 1985 hearing. Mr. Alten was the debtor's attorney in connection with the PSA and divorce proceedings. Both he and the plaintiff's attorney, Valerie Armstrong, Esquire were responsible for preparing the PSA entered into by the parties. Mr. Alten stated that he never discussed with the plaintiff her interpretation and understanding of the PSA entered into

---

1. Based upon weekly alimony and support payments of $850.00, the annualized payment is $44,200.00.

between the parties. Mr. Alten was questioned regarding the structure of the PSA. He testified that the PSA was set up in terms of debt. He testified at the December 9, 1985 hearing with regard to the debtor's agreement to hold the plaintiff harmless for the debt due to First Jersey National Bank South:

That would not fall within the division of assets. That would be the division of debt. The way this agreement is set up, for example, this part of the agreement talks about distribution, of what it was that was acquired during the marriage, and in this instance, the debt that was acquired during the marriage, this particular debt in regard to Ocean View Orthopedic, specifically in consideration of the wife re-signing for [sic] the corporation, Dr. MacDonald agreed to indemnify and hold her harmless for the debt which arose as a result of those items. (Transcript at p. 24).

The debtor also testified at the December 9, 1985 hearing. The debtor testified that as of the time of the hearing his net income was $5,900.00 per month, and that he was incurring monthly expenses in the amount of $6,000.00. The debtor testified that the original loan taken from the Guarantee Bank was a "business start-up" loan, which was used by him to purchase x-ray equipment and other business necessities. The July 23, 1982 note represented a negotiation of a line of credit with Guarantee Bank. The debtor testified that at that time the August 29, 1980 loan had been paid down to approximately $62,000.00. At the time of the execution of the Demand Note the debtor received approximately $20,000.00. The debtor testified that he has donated the subject x-ray equipment to a group and that he has taken an appropriate tax credit for the donation. The debtor did not advise the plaintiff of this donation.

The debtor testified that pursuant to the PSA, he agreed to pay the debts owed to the the Bank and the credit union. Furthermore, the debtor testified that, in addition to the alimony and support payments which he is obligated to pay monthly, he pays between $2,000 and $3,000 annually for the medical expenses of the plaintiff and their children.

With respect to his medical practice, the debtor indicated that he had begun the business known as Ocean View Orthopedic, Inc. in the fall of 1982. According to the debtor's testimony, that corporation is now "dying." On November 7, 1985, the debtor purchased a business known as Cape Shore Orthopedic from another physician and has been self-employed since that time. The debtor testified that he had been employed by Cape Shore Orthopedic prior to his purchase thereof and remains an employee of Cape Shore Orthopedic. He stated that prior to his purchase of Cape Shore Orthopedic, he was earning approximately $110,000.00 before taxes, with take-home pay of approximately $72,000.00. The debtor testified that his net income before taxes in 1983, when the PSA was entered into, was $225,000.00. The debtor stated that when the plaintiff indicated his gross income was $400,000.00, at that time, she was referring to what came into the practice from which malpractice insurance, rent, and other expenses had to be paid.

■ Section 523(a)(5) of the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, (Bankruptcy Code) provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree, or other order of a court of record or property settlement agreement, but not to the extent that—

(A) such debt is assigned to another entity, voluntarily, by operation of law, or otherwise (other than debts assigned pursuant pursuant to section 402(a)(26) of the Social Security Act, or any such debt which has been assigned

to the Federal Government or to a State or any political subdivision of such State); or

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.

In the case of *In re Calhoun,* 715 F.2d 1103 (6th Cir.1983), the Sixth Circuit explained that 11 U.S.C. § 523(a)(5) represents "Congress' resolution of the conflict between the discharge of obligations allowed by the bankruptcy laws and the need to ensure necessary financial support for the divorced spouse and children of the debtor." *Id.* at 1106. The *Calhoun* court noted that the legislative history unequivocally pointed to the fact that a determination of when a debtor's assumption of joint debts and the undertaking to hold a former spouse harmless as part of a separation or divorce agreement is in the nature of alimony, maintenance or support as opposed to a division of property is to be governed by federal bankruptcy law, not state law. The court noted:

Both the House and Senate Reports declare:

*What constitutes alimony, maintenance, or support, will be determined under the bankruptcy law, not State law.* Thus, cases such as *In re Waller,* 494 F.2d 447 (6th Cir.1974), are overruled, and the result in cases such as *Fife v. Fife,* 1 Utah 2d 281, 265 P.2d 642 (1954) is followed. The Proviso, however, makes non-dischargeable any debts resulting from an agreement by the debtor to hold the debtor's spouse harmless, on joint debts, to the extent that the agreement is in payment of alimony, maintenance, or support of the spouse, *as determined under bankruptcy law considerations as to whether a particular agreement to pay money to a spouse is actually alimony or a property settlement.* (emphasis supplied)

S.Rep. No. 95–989, 95th Cong., 2d Sess., 79, *reprinted in* [1978] U.S.Code Cong. & Ad. News 5787, 5865. *See also* H.R. No. 95–595, 95th Cong., 1st Sess., 364 (1977), *reprinted in* [1978] U.S.Code Cong. & Ad. News 5963, 6320.

*Id.* at 1107. The vast majority of federal courts are in agreement that this determination of whether a debt is alimony, maintenance or support for purposes of Section 523 of the Bankruptcy Code is a matter of federal bankruptcy law not state law. *See, e.g., Matter of Dorman,* 3 C.B.C.2d 497 (Bakrtcy.D.N.J.1981); *In re Seidel,* 48 B.R. 371 (Bkrtcy.C.D.Ill.1984); *In re Yeates,* 44 B.R. 575 (D.Utah 1984); *In re Pody,* 42 B.R. 570 (Bkrtcy.N.D.Ala.1984); *In re Harke,* 24 B.R. 645 (Bkrtcy.E.D.Mo.1982); *Hixson v. Hixson,* 23 B.R. 492 (Bkrtcy.S.D. Ohio 1982); *contra, Matter of Woods,* 561 F.2d 27 (7th Cir.1977). However, the court in *In re Bedingfield,* 42 B.R. 641 (S.D.Ga. 1983), explained that Congress intended that bankruptcy courts not be bound by state law when it defines an item as alimony, maintenance or support nor would they be bound to accept the characterization of an award as support or maintenance in the decree itself. 42 B.R. at 645–46. The court in *Bedingfield* noted, however, that most bankruptcy courts will take into consideration such factors as the intention of the parties in creating the obligation, the language and substance of the divorce agreement, extrinsic circumstances, as well as applicable state law. *Id.* at 646. Also, the court in *In re Harke,* 24 B.R. 645 (Bkrtcy.E.D.Mo.1982), noted that the Bankruptcy Code does not contain a definition of alimony, maintenance or support or any enumeration of the factors to be considered by the court when making a dischargeability determination under the Bankruptcy Code; therefore, even though a bankruptcy court must look to the substance of an obligation rather than to labels imposed by state law, a bankruptcy court's determination cannot help but be flavored by the state law since all domestic relations law is of state law origin. 24 B.R. at 647.

The court in *In re Calhoun, supra,* pointed out that a more searching inquiry is required than merely applying the traditional factors borrowed by state law and

the initial inquiry must be to ascertain whether the state court or the parties themselves *intended* to create an obligation to provide support through the assumption of the joint debts. 715 F.2d at 1109. The *Calhoun* court stated:

There is no basis for the bankruptcy court to create a non-dischargeable obligation for the debtor that the state court granting the divorce decree or the parties to that proceeding did not create. In making this determination the bankruptcy court may consider any relevant evidence including those factors utilized by state courts to make a factual determination of intent to create support.

*Id.* The courts are generally in agreement that determination of the intent of the parties at the time the agreement was entered into or the judgment was entered is the crucial issue in determining whether or not an agreement to assume a marital debt is support or a property division. *See, e.g., Matter of Coil,* 680 F.2d 1170 (7th Cir. 1982); *In re Bedingfield,* 42 B.R. 641 (S.D. Ga.1983); *Matter of Walter,* 50 B.R. 523 (Bkrtcy.D.Del.1985); *In re Seidel,* 48 B.R. 371 (Bkrtcy.C.D.Ill.1984); *In re Pody,* 42 B.R. 570 (Bkrtcy.N.D.Ala.1984); *Hixson v. Hixson,* 23 B.R. 492 (Bkrtcy.S.D.Ohio 1982); *In re French,* 19 B.R. 255 (Bkrtcy. M.D.Fla.1982); *Matter of Gentile,* 16 B.R. 381 (Bkrtcy.S.D.Ohio 1982).

The problem with determining the intent of the parties has been succinctly set forth by the court in *In re Alloway,* 37 B.R. 420 (Bkrtcy.E.D.Pa.1984):

at the time the alimony is awarded and the property divided, very often the parties have no intent to differentiate between an alimony debt and a property settlement debt and will view both merely as financial obligations arising from the separation or divorce. The parties would have no purpose or rationale in making the distinction without some awareness of the legal consequences of the choice such as that found in the disciplines of tax and bankruptcy law. Since the parties typically have no actual intent to make the distinction we must usually establish their constructive intent

from the facts and circumstances of the case.

*Id.* at 425. The court in *In re Calhoun, supra,* required a four-step inquiry to be made by the bankruptcy court to determine whether a debt assumption was to be considered support or property division. These four steps are:

(1) whether the state court or the parties to the divorce *intended* to create an obligation to provide support through the assumption of the joint debts;

(2) whether the assumption has the *effect* of providing the support *necessary* to ensure that the daily needs of the former spouse and any children of the marriage are satisfied;

(3) whether the amount of support represented by the assumption is not so excessive as to be manifestly *unreasonable* under traditional concepts of support, and, finally,

(4) if the amount of support is unreasonable, how much of the debt assumed can be fairly considered "in the nature of" support for purposes of federal bankruptcy law. 715 F.2d 1109–10.

The *Calhoun* court also noted that bankruptcy courts should also consider traditional state law factors such as "the relative earning powers of the parties, their financial status, prior work experience or abilities, other means of support and other facts relevant to the *substance of the result* achieved by the loan assumption in order to determine how much of the debt assumed can be fairly considered 'in the nature of' support for purposes of federal bankruptcy." 715 F.2d at 1110. In *Calhoun,* the court of appeals held that the bankruptcy court had erred by applying an incorrect legal standard, that is, that the clear language of the parties' separation agreement controlled the issue of dischargeability and, moreover, it had erred in shifting the burden of proof from the plaintiff-spouse to the debtor. *Id.* at 1111. The court directed that on remand the bankruptcy court should consider each loan obligation and that dischargeability could vary

depending upon the type of loan involved, its purpose and the circumstances of the parties. *Id.* The *Calhoun* court also observed that:

> If the circumstances of the debtor have changed from the time the obligation to the former spouse to pay joint debts was created so as to make such support now inequitable the bankruptcy court may consider the debtor's *current* general ability to pay insofar as it relates to the *continuing* obligation to assume the joint debts.

*Id.* at 1110, n. 11. Other courts have agreed that the court can look to the present financial condition of the debtor in determining the nature of the debt. *See, e.g., In re Bedingfield,* 42 B.R. 641 (S.D. Ga.1983); *In re Warner,* 5 B.R. 434 (Bkrtcy.D.Utah 1980). However, other courts have held that this consideration is irrelevant. For instance, in *Matter of Gentile,* 16 B.R. 381 (Bkrtcy.S.D.Ohio 1982), the court held that whether alimony was intended at the time of the dissolution depends upon the facts as they existed at that time and if the respective situations of the parties have changed, any adjustment of their respective obligations are matters of the state domestic relations court. *Id.* at 383. In *In re Yeates,* 44 B.R. 575 (D.Utah 1984), the court again criticized the court in *In re Warner, supra,* for stating that the financial condition of the debtor at the time of the bankruptcy was a relevant consideration. 44 B.R. at 580. The court noted, however, that the present financial condition of the former spouse would be relevant because a material and substantial improvement would change the nature of the payment from necessary support to a mere increase in income. *Id.*

A review of a few of the leading New Jersey cases provides some guidance as to what constitutes alimony, support or property division under New Jersey law.

In *Lepis v. Lepis,* 83 N.J. 139, 416 A.2d 45 (1980), the court held that a supporting spouse's obligation is determined mainly by the quality of the economic life which was maintained during the marriage, not by bare survival. The court noted that the general considerations in determining the support that an economically dependent spouse is entitled are the dependent spouse's needs, the spouse's ability to contribute to the fullfillment of those needs and the supporting spouse's ability to maintain the dependent spouse at the former standard. *Id.* at 152, 416 A.2d 45. The court noted that decisions regarding child support require a similar examination of the child's needs and the relative abilities of the spouses to supply them. *Id.* Similarly, in *Capodanno v. Capodanno,* 58 N.J. 113, 275 A.2d 441 (1971), the court noted that:

> A wife's "needs" will vary depending upon the case, for "needs" contemplate the amount of money necessary to maintain a wife in a manner as near commensurate as possible with her former status. [citations omitted]. In determining a wife's needs, a court should take into account the physical condition and social position of the parties, the husband's property and income, and the wife's property and income, if any.

*Id.* at 118, 275 A.2d 441.

In *Stein v. Fellerman,* 144 N.J.Super. 444, 365 A.2d 1382 (App.Div.1976), the issue before the court was whether various provisions of a "property settlement agreement" entered into by the parties and incorporated into the judgment of divorce were discharged in bankruptcy. The court held that the provisions in the agreement which stated, "defendant agreed to pay to plaintiff the sum of $80.00 per week for her support and maintenance, which payments would cease upon her remarriage" and "defendant agreed to pay the plaintiff $30.00 per week for the support of each of their three children" clearly constituted support and, as such, were nondischargeable. *Id.* at 447, 450, 365 A.2d 1382. However, two other sections of the property settlement agreement stated that, "defendant agreed to convey his interest in the marital home to plaintiff" and "defendant agreed to pay the principal and interest on the mortgage of the former marital home,

as well as property taxes, fire and liability insurance thereon, and repairs up to $300.00 annually, which payments were to cease when the principal balance due on the mortgage had been reduced to $4,876.56. Defendant's liability for repairs, taxes and insurance was to continue only as long as plaintiff remained unmarried and actually resided on the premises; his liability, however, for mortgage principal and interest would continue notwithstanding plaintiff's remarriage or her death." *Id.* at 447–48, 365 A.2d 1382. The court noted that if the obligation terminates on the death or remarriage of the spouse, and if the obligation is payable in installments over a substantial period, courts tend to rule that maintenance and support, and not a property settlement, was intended. *Id.* at 449, 365 A.2d 1382.

The court noted that the agreement for the debtor to meet the tax obligations on the house, provide for its maintenance and insurance, obligations which would terminate on the wife's remarriage, also constituted part of his agreement to provide support and were apparently being complied with. *Id.* at 450, n. 1, 365 A.2d 1382. The court noted that, "transfers of title to a marital residence do suggest a disposition of marital property, particularly when not otherwise designated in the agreement containing provision expressly designed for support. Support could be accomplished simply by permitting the donee spouse to live in the residence with the donor-spouse meeting the necessary carrying charges thereof." *Id.* at 450, 365 A.2d 1382. The court concluded that the agreement for the husband to meet the mortgage payment until the balance was reduced to a specified amount appeared to be part and parcel of the agreement to transfer title to the residences. *Id.* at 451, 365 A.2d 1382. It also noted that whether such lien reduction was accomplished by a lump sum payment or by installments, as provided in the agreement for the husband's benefit, was not significant and that the intent of the agreement was clearly that the wife was to have the residence with responsibility for the mortgage limited to the reduced amount.

Therefore, the court concluded this obligation was discharged by the defendant's bankruptcy. *Id.*

In a more recent case, *Loyko v. Loyko,* 200 N.J.Super. 152, 490 A.2d 802 (App.Div. 1985), the court held that the debtor's obligation under consent provisions of a final divorce judgment to make payments on a second mortgage encumbering the former marital home was in the nature of support and not dischargeable in bankruptcy. The court noted that, "the first inquiry must be to determine whether the parties intended to create a support obligation through the assumption of the joint debt by the supporting spouse." 200 N.J.Super. at 156–57, 490 A.2d 802. Relying on *In re Calhoun, supra,* the *Loyko* court noted that it must also be ascertained whether the obligation has the *effect* of providing support *necessary* to ensure the daily needs of the former spouse and children of the marriage are satisfied. *Id.* at 157, 490 A.2d 802. The court noted that in *Stein v. Fellerman, supra,* the determination had been made that the clear intentions of the parties was to dispose of the marital estate and the court had made no findings as to whether the husband's assumption of the debt had the effect of providing support necessary for the dependent wife and children. *Id.* The court observed that, in this case, the plaintiff had waived alimony although she received $120.00 per week child support for four children and that these support payments were clearly insufficient to sustain the basic needs of the minor children. She was unemployed at the time of the divorce and continued to be so. The *Loyko* court concluded that the clear economic realities facing the parties at the time the divorce agreement was entered into showed that the defendants' assumption of the mortgage debt was intended to constitute additional support for the four minor children. *Id.* at 157, 490 A.2d 802.

In *In re Harke,* 24 B.R. 645 (Bkrtcy.E.D. Mo.1982), the court aptly stated that, "a reading of the decisions construing § 523(a)(5) of the Bankruptcy Code (and its predecessor, § 17A(7) of the Bankruptcy

Act) reflects that Courts at all levels of the decision process are in general disagreement in respect of decretal and contractual requirements in the dischargeability context." 24 B.R. at 647. The majority of courts hold that the burden of proof regarding whether the debt assumption is support or property division is on the party asserting it is a nondischargeable debt. *See, e.g., In re Calhoun,* 715 F.2d 1103 (6th Cir.1983); *In re Bell,* 47 B.R. 284 (Bkrtcy. E.D.N.Y.1985); *In re Alloway,* 37 B.R. 420 (Bkrtcy.E.D.Pa.1984); *In re Fox,* 5 B.R. 317 (Bkrtcy.N.D.Tex.1980). However, in *In re Thomas,* 21 B.R. 571 (Bkrtcy.E.D.Pa. 1982), the court noted that although former Bankruptcy Rule 407 [2], applicable to that case, placed the burden of proving obligations imposed by the divorce decree are in the nature of alimony payments upon the party objecting to the discharge, once the objecting spouse has made a prima facie case, it is incumbent upon the debtor to show that he is entitled to a discharge of the disputed debt. *Id.* at 573, n. 3, citing to *In re Daviau,* 16 B.R. 421, 424 (Bkrtcy.D. Mass.1982).

Likewise, many courts have stated that the bankruptcy court, in determining whether an obligation is support or property division, must balance two competing considerations, i.e., requiring the debtor to fulfill his support obligations to his divorced spouse and children and that of giving the debtor a fresh start unencumbered by the burdens of pre-existing debts. *See, e.g., In re Calhoun,* 715 F.2d 1103 (6th Cir.1983); *In re Pody,* 42 B.R. 570 (Bkrtcy. N.D.Ala.1984); *In re Alloway,* 37 B.R. 420 (Bkrtcy.E.D.Pa.1984); *Hixson v. Hixson,* 23 B.R. 492 (Bkrtcy.S.D.Ohio 1982); *In re Warner,* 5 B.R. 434 (Bkrtcy.D.Utah 1980). However, in *In re Yeates,* 44 B.R. 575 (D.Utah 1984), the district court criticized this balancing test laid down in *In re Warner, supra.* The court noted that the language of § 523(a)(5) reflects a Congressional intent not to allow bankruptcy courts to balance competing policy considerations. *See* 44 B.R. at 579. The court reasoned that where Congress wanted to permit balancing, such as in the case of the exemption for educational loans, it so provided. *See* 11 U.S.C. § 523(a)(8).[3] The court stated that:

> The language in § 523(a)(8) shows that not expressly providing for balancing in § 523(a)(5) was not an oversight. Instead, the structure of § 523(a)(5) reflects Congressional intent that a balancing process not be used in determining whether an agreement to pay is support or a property settlement. The bankruptcy court should accept Congress's balancing and limit its inquiry to whether the agreement to pay is in the nature of alimony, maintenance, or support.

44 B.R. at 579. The vast majority of courts hold that there is no requirement that alimony, maintenance or support be owed directly to a spouse or dependent in order to be non-dischargeable under the Bankruptcy Code. *See, e.g. In re Calhoun,* 715 F.2d 1103 (6th Cir.1983); *In re Spong,* 661 F.2d 6 (2nd Cir.1981); *In re Bedingfield,* 42 B.R. 641 (S.D.Ga.1983); *Matter of Romeo,* 16 B.R. 531 (Bkrtcy.D.N.J.1981). For in-

---

**2.** Former Bankruptcy Rule 407 provided:

BURDEN OF PROOF IN OBJECTING TO DISCHARGE

At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the facts essential to his objection.

Bankruptcy Rule 4005, effective August 1, 1983, and applicable to the instant case provides:

BURDEN OF PROOF IN OBJECTING TO DISCHARGE

At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving his objection.

**3.** 11 U.S.C. 523(a)(8) provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a non-profit institution, unless—

(A) such loan first became due before five years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

stance, in *Hixson v. Hixson*, 23 B.R. 492 (Bkrtcy.S.D.Ohio 1982), the court noted:

> The major contention of the debtor in his memorandum is that the payments on the first and second mortgages are dischargeable because the payments are not to be paid to the wife, but rather to creditors. This argument exalts the form of the obligation over its substance, and is therefore not persuasive. In addition the legislative history of 11 U.S.C. § 523(a)(5) does not support the debtor's position.
>
> > "If the debtor has assumed an obligation of the debtor's spouse *to a third party* in connection with a separation agreement, property settlement agreement, or divorce proceeding, such debt is dischargeable to the extent that payment of the debt by the debtor is not actually in the nature of alimony, maintenance, or support of debtor's spouse, former spouse, or child." (emphasis supplied) [124 Cong.Rec. H11,-096 (daily ed. Sept. 28, 1978) ] (remarks of Rep. Edwards); [124 Cong.Rec. S17,412 (daily ed. Oct. 6, 1978) ] (remarks of Sen. DeConcini)

23 B.R. at 496.

Most federal cases engaged in the determination of whether an agreement to assume a debt is child support or property division have enunciated various factors to be considered. Initially it should be noted that "[a]n agreement providing for allocation of property and assumption of debts by one party or the other is usually a property settlement." *Matter of Walter*, 50 B.R. 523, 524 (Bkrtcy.D.Del.1985). Moreover, every assumption of a joint loan obligation in a divorce decree or settlement contributes, at least indirectly, to the support of the former spouse. *In re Calhoun*, 715 F.2d 1103, 1108 (6th Cir.1983). Nevertheless, these presumptions have been overcome in many cases where the court found that after an analysis of pertinent factors, the assumption of the debt was in the nature of support. Other courts have also enunciated factors to be consideration in determining the dischargeability of the assumption of a marital debt. For in-

stance, in *In re Petoske*, 16 B.R. 412 (Bkrtcy.E.D.N.Y.1982), the court noted that although no one factor is controlling, the factors to be considered are the nature of the obligation assumed, ("necessaries indicating alimony or support"), the location in the separation agreement, whether a lump sum or terminable periodic payments were provided for, the length of the marriage, whether children resulted which had to be provided for, the relative earning power of the spouses, the adequacy of support absent the debt assumption, and the parties' negotiations and understanding of the provisions. 16 B.R. at 413–14. In *Petoske*, the debtor had agreed to assume joint responsibility of joint debts for Mastercard, VISA, Fortunoff, Sears, J.C. Penney's, and Macy's. *Id.* at 413. The court noted that the plaintiff had testified that she waived her right to alimony in exchange for the debtor's assumption of the joint debts, that this was the understanding under which the stipulation was negotiated and that this provision was necessitated due to the inadequacy of her income and child support payments to support herself and her child if she had to remain primarily liable on the debts. *Id.* at 414. The court noted that her testimony was credible and essentially uncontroverted by the debtor and was also bolstered by several of the enumerated factors. For instance, there was a disparity of income in that the plaintiff was employed as a secretary with a gross income of $150.00 per week while the debtor had a gross salary of at least twice that amount as well as working a second job "off the books." *Id.* Moreover, the court noted that the paragraph in which this provision appeared was grouped with provisions for maintenance of life and medical insurance by the debtor and payment of his wife's counsel fees. Another paragraph specifically dealt with the division of property. *Id.* Similarly, in *In re Harke*, 24 B.R. 645 (Bkrtcy.E.D.Mo.1982), both parties waived maintenance although the debtor was to pay child support to his ex-wife who had custody of their two minor children. In their separation agreement, both parties

promised to pay certain marital debts and hold the other party harmless from payments of those debts, with the debtor agreeing to paying a majority of the outstanding marital debts. In determining that the debtor's obligation to pay the marital debts was not dischargeable the court looked to the wife's testimony that she would not have waived maintenance if her husband was not to assume the debts. The court looked to the disparity of income and the strain it would create on the wife to have her be liable on those debts. It concluded that the unequal division of debts was an attempt to balance the disparity in the incomes of the parties and thus was support. *Id.* at 649. The court in *Hixson v. Hixson, supra,* also enumerated a lengthy number of factors to be utilized by the court in determining the substantive nature of a debtor's obligation. They are: (1) the express terms of the separation agreement; (2) the relative incomes of the parties; (3) the length of the marriage; (4) the number and age of the children; (5) the amount of child support; (6) whether the obligation terminates on death or remarriage of the recipient or donor spouse; (7) whether the obligation is payable in installments over a long period of time; (8) the level of education of the parties; (9) the health of the parties; (10) the probable need for future support; (11) the property brought to the marriage by either party, and (12) whether the payments are intended as economic security. 23 B.R. at 495. In *Hixson,* the husband had deeded real estate to his wife who agreed to pay the balance on the first mortgage from the sale proceeds. The wife was unable to sell the property. The husband had agreed to pay the first and second mortgages on the real estate and the real estate taxes until the property was sold. The wife waived future alimony support and maintenance. The court held that the husband's assumpton of debts evidenced an intent of the parties to provide the wife with economic security and thus were in the nature of maintenance and support. 23 B.R. at 496. The court also looked to the fact that the parties had been married 33 years and the husband

was to pay the wife $20.00 for one year starting on the day following the close of the sale of the real estate. Also, there were no children born of the marriage and at the time the wife's net income was $110.00 per week when she worked periodically as a sales clerk. In contrast, the husband earned $17,000 a year and had been a laboratory technician for 10 years. *Id.* at 494. Similarly, in *Matter of Gentile,* 16 B.R. 381 (Bkrtcy.S.D.Ohio 1982), the husband was obligated to pay child support but no alimony. The wife received the house with the mortgage and the furniture and the husband was to pay all outstanding debts which was under the division of property section of the agreement. The debts in issue were to Beneficial Finance, VISA, Sears, Penney's and Shillito's. At the time the wife made $100.00 per week and the husband made $400.00 per week. The court noted that the wife's salary was not enough, even with $70.00 per week child support, to meet the payments of the outstanding debts. It noted:

> Relief by way of payment of debts, an obligation which defendant assumed in the dissolution agreement, must have been intended as a further contribution towards the sustenance of this now separated family. It is obligations of this sort which are comprehended within the word "alimony."

*Id.* at 383.

Two cases arising out of the Third Circuit have held that the assumption of a marital debt is not dischargeable. In *In re Thomas,* 21 B.R. 571 (Bkrtcy.E.D.Pa.1982), the husband conveyed to the wife his interest in the marital residence and agreed to pay the second and third mortgages on the marital residence as well as arrearages on the first mortgage as of April 1, 1981. The husband subsequently filed a petition in bankruptcy. The court found that the mortgage obligations were necessary for the support and maintenance of the wife. The parties had been married for 23 years and incorporated in the decree was an alimony, support and property settlement agreement in which the debtor had con-

veyed to the plaintiff all of his right, title and interest in the marital residence. It was on this property that the debtor had agreed to pay the mortgages. The court looked to the fact that at the time of the divorce, the debtor earned in excess of $40,-000.00 annually while the plaintiff was un-employed, in poor health, advanced in age and had little prospect of being gainfully employed now or in the future. *Id.* at 573. The court noted that, "the increase burden of the obligations which the debtor is at-tempting to discharge if shifted to her, would be financially devastating." *Id.* The court held that in light of the relative financial status of the parties, the pay-ments were unquestionably support and maintenance. *Id.* at 573–74. The court in *Thomas* distinguished *In re Woods*, 561 F.2d 27 (7th Cir.1977), where an agreement to assume debts was held to be dischargea-ble due to the fact that the debts dis-charged in *Woods* were not mortgages but bills largely due on household furnishings which obligations are in the nature of a property settlement. *Id.* at 573. The court held that "obligations to pay bills unlike mortgages, incurred during a marriage and assumed by the debtor too tenuously and indirectly benefit the plaintiff-spouse to be considered in the nature of support." *Id.* In *Matter of Walter*, 50 B.R. 523 (Bkrtcy. D.Del.1985), the court made a determina-tion that a joint debt due Household Fi-nance Company (HFC) was nondischarge-able. During the marriage the debtor and plaintiff had become jointly liable on a loan of approximately $25,000.00 from HFC, se-cured by a second mortgage on their home. The proceeds of this loan were used to buy a truck for the debtor's business. The plaintiffs separated in 1982 after 26 years of marriage. On August 13, 1982 they signed a separation agreement which had separate headings including "Alimony", Child Support", and "Debts." Under the separation agreement, the debtor agreed to pay the debt of HFC; however, this as-sumption of the loan appeared in a para-graph other than the one titled "Alimony." During their married life, the wife was primarily devoted to keeping house and

raising the children although at some point during the marriage she became a school bus driver and continued in that line of work earning approximately $72.00 per week. *Id.* at 524. The court noted:

> Plaintiff's income as a school bus driver, alimony of $200 a month and child sup-port would have been insufficient to maintain the daily necessities such as food and clothing, payment of the first mortgage as well as other expenses inci-dent to maintaining a home and a second mortgage of $480.00 per month. More-over, the proceeds of the loan did not go to increase the value of the home. The debtor's assumption of the second mort-gage payment was essential to maintain the family home.

*Id.* at 525. Consequently, the court held that the debtor's agreement to assume the HFC obligation was in the nature of alimo-ny, support or maintenance and, therefore, nondischargeable under 11 U.S.C. § 523(a)(5). *Id.*

It is also instructive to look at cases in which the debtor's assumption of the mari-tal debt was held not to be support or maintenance and determine the court's un-derlying rationale for so holding. The court in *In re Bedingfield*, 42 B.R. 641 (S.D.Ga.1983), reviewed the material facts of a separation agreement entered into by the parties on August 31, 1980 and conclud-ed that the debtor's obligation under the divorce decree were approximately $60,-000.00 per year. The debtor was self-em-ployed as an orthopedic surgeon and his gross income was in excess of $100,000.00 for 1979 and 1980 and was approximately $70,000.00 in 1981. The debtor's ex-wife was a fulltime law student with no earned income. The court found that the hus-band's obligation to pay the wife additional alimony of $432.69 a month for 12 years, regardless of her marriage or death, was not actually in the nature of support. The agreement stated: "This monthly payment is equal to the monthly installment of the first mortgage on the parties' former mari-tal residence." *Id.* at 643. In addition, the court noted that at the time the agreement

was entered into, it was the parties' understanding that the wife and children would move and would not be living in the marital home on a fulltime basis and that, in fact, after one year, the house was rented to a third party for an amount in excess of the monthly mortgage payment. The court noted that although this obligation was designated as alimony in the divorce agreement, the court's inquiry into the nature of this liability did not end there. The court noted: "It is the basis for creation of the obligation which determines whether it was intended as an equalization of property rights or as support and maintenance." *Id.* at 648. The court noted that the obligation to make the payments was to continue even after the wife's remarriage and become a debt to her estate should she die before the expiration of the 12 years and, thus, this continuation of payments "after her need for support terminates" indicated that the obligation was a property division rather than support. *Id.*

In *Matter of Wesley*, 36 B.R. 526 (Bkrtcy.S.D.Ohio 1983), the court found that the parties were married on March 11, 1982 and separated in July of 1982. The wife initiated divorce proceedings and on January 26, 1983, a hearing was held before a referee who issued a report which was subsequently incorporated into the decree of divorce on April 15, 1983. No children were born of the marriage. Prior to the marriage the wife and her eight year old son from a prior marriage had lived in the house trailer which she owned free and clear and approximately one month after her marriage to the defendant, the wife sold the trailer for $9,000.00. The referee found that of the $9,000.00, $4,224.35 was expended on the purchase of a 1979 Harley-Davidson motorcyle titled in the name of the husband. Both parties disputed the accuracy of this finding but neither challenged it by way of appeal and the court adopted the referee's finding. The referee recommended and the court decreed that the husband retain possession of the motorcycle. The husband was required to pay the wife $4,200.00 as lump sum alimony. The marital house was deeded back to the

lender in lieu of foreclosure. The bankruptcy court concluded that the repayment of the $4,200.00 labeled "lump sum alimony" was nevertheless intended by the parties and the court to be in the nature of a debt repayment. The court relied primarily on the fact that it found it "more than coincidental that the amount of the lump sum award corresponds exactly with the amount of the proceeds from the sale of the trailer which the referee found was expended by plaintiff to purchase defendant's motorcycle." *Id.* at 530. Moreover, the award of a lump sum alimony as opposed to continuous payments over a long period of time was held to be a clear indication that the award was intended as a property settlement, not support. The court also looked to the fact that the marriage was extremely short in duration and that the parties had had no children. Also, the court noted that the plaintiff, by her own admission, was supporting herself and her son prior to the marriage and there was no evidence in the record which indicated she was presently unable to support herself. *Id.*

In *In re French*, 19 B.R. 255 (Bkrtcy.M. D.Fla.1982), the husband had agreed to hold the wife harmless from indebtedness to Commercial Credit Corporation, which was secured by a 1973 automobile. Because the defendant failed to carry out his obligation, the wife, as joint debtor, was required to satisfy the debt and now claimed that the hold harmless provision was in the nature of child support for a minor child born to the parties during their marriage. The court noted that the stipulation agreement contained elements of both property settlement and child support and the hold harmless provision appeared among those provisions dealing with division of marital property. Moreover, the court noted that there was no language in the agreement itself which in any way connected the hold harmless provision with the support of the minor child. The wife contended that the tie between the hold harmless provision and the support of the minor child was that the hold harmless provision

was intended to prevent her wages from being garnished, thereby ensuring the support of the minor child. The court found this argument tortured and found that in unambiguous terms the agreement provided that the husband was to pay $50.00 per week and to maintain life insurance with the child as beneficiary and pay all medical expenses not covered by insurance. The court concluded that at the time the parties entered into the stipulation agreement they did not consider the hold harmless provision to be in the nature of child support for the minor child and, therefore, the debt was dischargeable. *Id.* at 256.

In a case arising in the Third Circuit, *In re Alloway*, 37 B.R. 420 (Bkrtcy.E.D.Pa. 1984), the debtor's former wife objected to the discharge of a debt which was created by the wife's payment to the IRS in satisfaction of tax liens for which the debtor had assumed responsibility under a property settlement agreement. The agreement, in part, transferred the debtor's interest in jointly held property to the wife and further provided the debtor would be responsibilty for the payment of several liens on the property held by the IRS. The court noted that:

> The case law reveals that the following factors, as well as others, are relevant in distinguishing alimony from a property settlement debt: the label given to the debt by the parties and the state court; the express terms of the debt provision at issue in the settlement agreement or decree and its placement in the context of the document; whether the obligation is payable in installments over a substantial period of time or is a lump sum payment; whether the obligation terminates on the occurrence of a condition such as the spouse's remarriage or death; whether the debt was allocated in lieu of a greater allowance of alimony; the relative income of the parties; the length of the marriage; children from the marriage who require support; whether the support award would be inadequate absent assumption of the debt; whether the debt was incurred for a ne-

cessity; and whether the debt is a past or future obligation. [citations omitted].

*Id.* at 425. The court also noted that the record was less than replete with evidence for the court to determine which of two federal policies, i.e., granting the debtor a fresh start versus the debtor's obligation to support his former spouse and family, had primacy. *Id.* The court noted that there was no documentation of the relative income of the parties, the cost of housing at issue or the necessary expenses of each party. *Id.* at 425–26. The court explained that while this information should be necessary in every case, it was especially necessary in this case because an IRS tax debt does not bear the typical trappings of alimony, maintenance or support. *Id.* at 426. It is a single lump sum obligation rather than an obligation payable at intervals for an uncertain period of time which would end at the death or remarriage of the spouse. The court noted that "[a] debtor's promise to hold the other spouse harmless in the repayment of any joint obligations would always tend to ameliorate the spouse's financial condition, but unless a spouse bears her burden of proving that the debt is more akin to alimony, maintenance or support rather than a mere distribution of property, the debt will be discharged." *Id.* In *In re Pody*, 42 B.R. 570 (Bkrtcy.N.D.Ala.1984), by stipulation of the parties, the wife was to receive all the real estate and a 1975 automobile and the debtor was to make the payments on the above property, to make the payments on a loan secured by savings account of the debtor's family members and to pay all of the accounts, debts and other obligations of the parties incurred prior to their separation. *Id.* at 572. The court held that the obligation created by the divorce decree should be discharged in bankruptcy. The court noted that there was no clear evidence as to the level of income of the parties or their earning potential but both had been employed during the marriage. The parties had been married seven years and there were no children born of the marriage. No support or alimony was awarded. The

court noted that the factors for the court to consider were:

1. Whether children were born of the marriage;

2. The parties' levels of income;

3. Whether there was a division of property and a division of the debts relating to that property;

4. Whether the former spouse had shown a need for additional support;

5. Whether the former spouse was shown to have suffered in the job market, or was otherwise disadvantaged, because of any dependent position held in relation to the debtor during the marriage; and

6. The age and health of the former spouse.

*Id.* at 573. The court held that the debtor's former wife had not shown a need for support due to advanced age, poor health, or any disadvantage suffered in the job market or otherwise, as a result of her marriage to the debtor or any other factors which would support a finding that the debts in question owed to the debtor's former spouse were in the nature of support. *Id.*

A similar case is that of *In re Bell,* 47 B.R. 284 (Bkrtcy.E.D.N.Y.1985), where the parties had been married approximately three and one-half years, had no children and the court found that they were both gainfully employed in occupations with rewarding futures. *Id.* at 284. The parties assumed financial obligations jointly and both had signed as joint tenants a three year lease for a certain apartment. Pursuant to the stipulation agreement which was drawn up and later incorporated into the divorce decree, the debtor assumed responsibility for the payment of rent on this lease, gas, telephone and electric until such time as the wife elected to vacate the premises at which time the debtor assumed responsibility for the remainder of the lease. Thereafter, the debtor stopped paying the expenses set forth and subsequent to that filed a Chapter 7 petition. In the interim the wife had instituted suit in the state court and recovered a judgment for arrears plus interest. The bankruptcy court reviewed the factors to be considered in determining whether the debt in question was support or property division relying on the factors set forth in *In re Petoske, In re Calhoun,* and *In re Pody, supra.* The court noted that although payment of rent, an obvious necessity, usually indicated alimony, other factors dictated a contrary result. The court noted that the structure or terms of the·agreement did not evidence any intent that the agreement be in nature of alimony; there were no children born of the marriage; the relative equal earning power of the spouses; and, the fact that the agreement was largely concerned with the division of property, and the assumption of finite debts, indicating the parties' desire for a clean split and not an obligation of lasting support. *Id.* at 287. The court held that the intent of the parties that the wife was to relocate, at least by the end of the lease term, indicated that the plaintiff had no legitimate expectations of receiving payments in the nature of support. *Id.*

This court finds based upon a consideration of all the facts herein that the debtor's agreement to indemnify and to hold the plaintiff harmless on account of joint obligations owed to First Jersey National Bank/South and Navy Federal Credit Union are in the nature of alimony, maintenance and support and therefore not discharged by the debtor's discharge in bankruptcy.

The plaintiff testified that she consented to the PSA based upon the debtor's agreement to assume responsibility for the two subject debts and that she would not have otherwise consented to the PSA because she could not afford to raise four children and pay these debts. The debtor admitted his intent to assume the subject debts. The parties had an uneven earning capacity. The debtor was in a better position to support himself than the plaintiff, whose educational level and prior work experience is a limiting factor. The fact that the subject obligations are structured as "debts" in the PSA is not controlling.

An examination of the parties' relative financial condition supports the plaintiff's analysis of her own financial condition. The plaintiff's only income is the alimony and child support she receives under the PSA. Her demonstrated earning capacity of $225.00 per week, before taxes, is significantly disparate in relation to the debtor's demonstrated earning capacity. The debtor testified that in 1983, the year the PSA was executed, his net income before taxes was $225,000.00.

*Calhoun* recognized that "[t]he distribution or existence of other property may make other forms of support unnecessary." 715 F.2d at 1109. The non-existence of other property may likewise make other forms of support payments necessary. *See In re Lineberry*, 55 B.R. 510 (Bkrtcy.W.D. Ky.1985).

Here, the division of assets under the PSA is relevant. The plaintiff received a lump sum payment of $45,000.00 in return for her waiver of rights in the marital premises, the corporation known as Ocean View Orthopedic, Inc., any and all right, title or interest she might have in other marital assets, including her husband's pension plan and profit sharing plan. The marriage was of reasonably long duration, and four children were born of the marriage, requiring support.

In light of these factors, this court is of the opinion that the intent of the parties was to create a support obligation. In considering these same factors, this court is satisfied that the support provision has the actual effect of providing necessary support. This is not a case where the distribution or existence of other property renders other forms of support payments to the plaintiff and their children unnecessary.

This court finds no change in circumstances of the debtor from the time of the execution of the PSA to make such support inequitable. While admittedly projections as to the debtor's future earning capacity are speculative, the debtor's circumstances have not changed. The debtor still has his medical degree and is pursuing his special area of practice. Nor does this court find that the amount of support is unreasonable under traditional concepts of support. The court here considers the unequal earning powers of the parties and the financial status of the parties and the limited prior work experience of the plaintiff, the length of the marriage, and the number and age of the children born of the marriage.

The court notes that there are two distinct obligations involved in an agreement to assume former joint marital debts: (1) the underlying debt owed to the mutual creditor, and; (2) the obligation owed directly to the former spouse to hold the spouse harmless on that underlying debt. *See In re Calhoun*, 715 F.2d at 1106, n. 4. It is the dischargeability of the latter obligation that is at issue in this case. The debtor's obligation to pay his various other creditors, those creditors in respect of whose debts he promised to pay and to indemnify and hold the plaintiff harmless, are discharged by his discharge in bankruptcy.[4] The debtor's obligation to the plaintiff and their children has not been discharged. Thus the debtor is required to reimburse or to indemnify and hold plaintiff harmless only to the extent that the plaintiff is actually required to make payment to First Jersey National Bank/South and Navy Federal Credit Union.

■ Plaintiff has also requested counsel fees and costs incurred in connection with the instant complaint. It is well settled that legal fees and costs expended by a non-debtor spouse for enforcement of non-dischargeable debts are similarly non-dischargeable. *See In re Dorman*, 3 C.B.C.2d

---

4. As of the date of this opinion, the debtor has not been granted a discharge. A complaint objecting to the discharge of the debtor pursuant to 11 U.S.C. § 727(a)(3) was filed by William P. King, a creditor herein (Adversary No. 85-0147). This court, after a trial on the merits of that complaint, denied the creditor's objection to the debtor's discharge and entered an order on December 9, 1986 consistent with that decision. A general discharge will be hereinafter issued accordingly.

497 (Bkrtcy.D.N.J.1981); *Matter of Romeo,* 16 B.R. 531 (Bkrtcy.D.N.J.1981).

Accordingly, counsel fees and costs of suit shall be allowed to the plaintiff. Counsel for plaintiff shall file with this court forthwith an affidavit of services rendered and costs incurred.

An order shall be submitted in accordance with this opinion.